IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EQUIP FOR EQUALITY, Protection & Advocacy System for People with Disabilities in Illinois,<br><br>Plaintiff,<br><br>v.<br><br>LATOYA HUGHES, Acting Director, Illinois Department of Corrections,<br><br>Defendant. | Case No.: 25-1565 |

## COMPLAINT

Equip for Equality, by and through counsel, brings this action against Defendant Latoya Hughes, Acting Director of the Illinois Department of Corrections (IDOC) as follows:

## INTRODUCTION

1. The Illinois Department of Corrections (IDOC) has indefinitely stranded 21 people with disabilities and serious medical needs at Stateville Correctional Center (Stateville), which Illinois closed last year due to structural conditions that the state found made the century-old prison unfit for human habitation.

2. In 2024, IDOC transferred almost the entire population of people housed at Stateville (including all those without disabilities) to other prisons around the state. Yet they left behind a small group of people—all with disabilities—in Stateville's derelict infirmary.

3. With the main part of Stateville closed, those left behind in the infirmary are denied the basic resources of a working prison such as recreation, a dining hall, a law library, and a commissary. They sit locked in cells for up to 24 hours a day, suffering the ill effects of isolation on their physical and mental health.

1

4. This is an action for prospective injunctive relief to redress violations of federally protected rights under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.* and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. §794.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. §§ 1343(a)(3) and (4) (civil rights).

6. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this district.

## PARTIES

7. Plaintiff Equip for Equality (EFE) is a statewide Illinois-based 501(c)(3) nonprofit organization with its main office in Chicago, Illinois. EFE serves as the Protection and Advocacy ("P&A") system for the State of Illinois, as mandated by Congress, to protect the civil rights of persons with disabilities. EFE is authorized under multiple federal statutes to pursue legal relief to protect the rights of people with disabilities, including people with disabilities in the custody of IDOC. 42 U.S.C. § 15043, 42 U.S.C. § 300d-53(k), 42 U.S.C. § 10805, 29 U.S.C. § 794e(f), 34 CFR §381.3.

8. Defendant Latoya Hughes is the Acting Director of the Illinois Department of Corrections. She has responsibility for IDOC's administration and overall operation of all prisons in the State. She is sued here in her official capacity.

## FACTUAL ALLEGATIONS

*The Closure of Stateville*

9. Stateville, opened in 1925, has been severely neglected by the state. A third-party vendor hired by IDOC determined the prison had $250 million in deferred maintenance costs and was approaching an inoperable condition. The conditions of confinement have long been so poor that they have been the subject of extensive federal civil rights actions, including a class action filed in 2013 for the structurally unsafe living conditions.

10. Specific to the infirmary unit, in 2023 a court-appointed independent monitor over IDOC's medical care system (in the *Lippert v. Jeffreys* consent decree) condemned the infirmary at Stateville as being ridden with vermin and otherwise unsafe for individuals with disabilities. See Seventh Annual Report to the Court, Dkt. No. 1725 (No. 10-cv-04603, ILND).

11. In March 2024, Illinois Governor J.B. Pritzker announced a plan to close Stateville, "to address years of disinvestment in facilities built almost a century ago, saving the state hundreds of millions in deferred maintenance and annual upkeep costs." State of Illinois, "Governor Pritzker Announces Plan for Transformative Capital Investments in Illinois Department of Corrections Facilities," https://www.illinois.gov/news/press-release.29750.html#:~:text=The%20capital%20investments%20will%20begin,maintenance%20and%20annual%20upkeep%20costs (Mar. 15, 2024).

12. In June 2024, IDOC appeared at a hearing before the Commission on Governmental Accountability and Forecasting (COGFA) regarding the closure. Defendant Hughes emphasized "the urgent need to act now" since the "current living conditions at

Stateville are not conducive to rehabilitation" and the need to "address serious safety and security concerns posed to those who live and work at Stateville by the aging infrastructure."[1]

13. Equip for Equality testified at the hearing about the risks that the facility posed to people with disabilities and serious medical conditions. In response to that testimony, one State Senator serving on the commission commented that regardless of whether the full facility closed, these individuals should not be housed there because their needs could not be met.

14. On August 9, 2024, the district court in the longstanding class action litigation over the structural conditions in Stateville's housing units entered a preliminary injunction requiring the state to transfer all individuals out of the housing units. *Dobbey v. Weilding,* No. 13 C 01068, Dkt. 386. The State did not dispute that the class members were at imminent risk of harm from falling concrete as the court found. *Id.* at 2.

15. Beginning in September 2024, IDOC transferred almost the entire population of Stateville to other prisons, except for individuals housed in the infirmary and around a dozen others with disabilities who IDOC moved from the housing units into the infirmary. IDOC closed each housing unit at Stateville except for the Health Care Unit (infirmary).

16. In November 2024, the *Lippert* monitor reported again that "the infirmary unit at Stateville is unfit for housing medical patients" and recommended that it "should also be closed" with the rest of the prison. See Eighth Annual Report to the Court, Dkt. 1893 (No. 10-cv-04603, ILND).

*Prisoners with Disabilities Left Behind*

17. Approximately two dozen men were left in the infirmary after Stateville was otherwise closed. Since then, one has died and two were released on parole. Twenty-one remain

---

[1] Transcript of COGFA Town Hall Proceedings, Dkt. No. 373-13, *Dobbey v. Weilding*, (No. 13-cv-01068, ILND).

today. Around half of them were previously housed, at least at times, in the infirmary for medical care needs. Although the Stateville infirmary is not a safe and functional medical unit, IDOC has stranded them there.

18. The other dozen individuals had previously resided in regular housing. Although they had re-occurring medical treatment needs for kidney disease, they did not—and do not now—require placement in the infirmary for medical care. Instead, they would visit the health care unit for their regular dialysis treatments as needed. But after closing Stateville, rather than transferring this group—and the dialysis treatment equipment—with the rest of the population, IDOC moved them to the grossly inadequate Stateville infirmary.

19. Despite ongoing requests from these individuals being held in the infirmary, and their advocates, IDOC has failed to move them.

*Confinement in a Closed Prison*

20. The prisoners with disabilities are locked in their cells in the infirmary for many hours and sometimes for days at a time. They are no longer allowed to go to the dining hall—instead, cold food trays are slid through an opening in their solid cell doors. They cannot go to the barber shop that previously operated at Stateville, shop in the commissary, or visit the law library. They no longer have access to jobs or school.

21. Stuck in their cell for days on end, they have little to do other than stare at the walls or pace the floor. Some write letters to their families, but only if they have enough stamps left from the last opportunity to order commissary. There is no dayroom and there are minimal opportunities for recreation or socialization.

22. Although most of the remaining individuals at Stateville are medium or minimum security, the unit is run as entirely maximum-security housing. This means they are even further restricted than they should be by reason of their disability.

23. Because many of the regular programs and services of the prison are closed, these individuals' privileges are further restricted beyond what even those in higher security classifications experience. It is more difficult to access phone calls, and even their purchased tablets—generally allowed even in maximum security to send messages to family or listen to music—are unusable in the infirmary.

24. Those left behind in the infirmary compare it to disciplinary segregation or solitary confinement. One individual who was recently placed in restrictive housing said the technical change in his status made little to no difference in how he was treated.

25. Other than showers and medical care, the only regular time out of their cells is a few hours of "yard" time a few times each week in a small area next to the unit. This yard area is much smaller than the "big yards" that they used to go to when the prison was open. It does not have the phones, exercise equipment, a walking path, basketball court, or other features that exist in the closed sections and that are standard in IDOC prisons. As one individual explained, "we are just expected to sit out there like yard ornaments," noting that the lack of exercise is contributing to his poor health.

26. Even that limited time outdoors is not always afforded to everyone. For example, when individuals are getting their dialysis treatment during the short yard period, they are not provided yard time later. Those individuals have days or even weeks when their only time out of cell is spent on dialysis, where they sit for several hours hooked up to a machine in a cramped, windowless room with no television, radio, or reading material.

27. The constant isolation takes an intense toll on individuals' mental health. Several who had not previously needed mental health treatment at IDOC have developed troubling symptoms of depression, anxiety, paranoia, and hopelessness, noticing concerning changes in their own behaviors and thought patterns. They find themselves crying, pacing, or talking to themselves as they feel uncharacteristic flashes of anger or panic. Some wonder aloud if death would be preferable.

28. Those abandoned in the Stateville infirmary when the rest of the facility closed feel that they have been left behind to die. Since the closure, staff have become increasingly careless and neglectful, and the individuals feel trapped in a system that has forgotten about them. In their isolation, they fear there will be no repercussions for the abuse and neglect they experience.

29. Their fears were confirmed in traumatic fashion when one of their peers died in late December. Although young and purportedly only being held at Stateville for the purpose of providing him with medical care, the other individuals in the unit witnessed staff disregard his urgent medical needs for hours leading to his death. Like them, he was locked in his cell with no ability to go to a "sick call" or get help. A week later, two individuals heard staff laughing about the man's absence, joking that he was "on a permanent writ."

30. The isolation also takes a toll on their physical health. Several even notice their mobility and strength diminishing. The absence of full dining and commissary services since the closure is similarly problematic. Individuals cannot follow their medically prescribed diets, nor access hygiene products and other necessities when needed. At least one patient with kidney failure has been repeatedly hospitalized because of elevated potassium in his diet, causing his muscles to seize up. Others have been hospitalized due to infections they contracted in the unit.

Rather than being necessary for their medical treatment, the conditions in this infirmary are deleterious to their health.

31. Prior to the closure, Stateville—like other prisons around the state—operated educational, vocational and rehabilitation programs for its population. Now, those left in the infirmary have no access to those programs.

32. For example, one individual was attending school 3-5 days a week before the closure; he had completed the Adult Basic Education (ABE) course, passed the test to enter the next level of education, and received good time credit for his sentence. He was set to continue his education, enrolling in the pre-GED course and then GED classes, for which he could expect to receive additional sentence credit, but the school programming was shut down along with the rest of the facility.

33. Another individual in the infirmary had been enrolled in a college class through DePaul University's program at Stateville, attending three one-hour classes each week. When Stateville closed, the program transferred to another facility but—because of his disability—he was left behind and now cannot participate. Another person was enrolled in an art class while in general population to which he no longer has access. Others were on the waitlist to be able to join college classes and other educational programs at Stateville, but no longer.

34. Prior to the closure, several of the individuals had regular mental health treatment services, whether group or individual, with their providers. But now because they are confined in the infirmary, they have lost access to those programs and services. One individual, although previously housed in the infirmary, was still able to have weekly sessions with his mental health provider. Another individual, who was previously housed in general population, saw his provider every two to four weeks. Although his symptoms have become acute, IDOC no longer operates

those mental health services at Stateville. Instead, the only contact with mental health staff is in crisis or emergency situations in which case mental health staff might be pulled over from the nearby, but separate, reception center.

35. The context in which this is occurring is one of filth and disrepair, making the isolation and cell restriction all the more harmful. The individuals continue to regularly see flies, centipedes, and cockroaches in treatment spaces; the dialysis room is cluttered and dirty. The showers are not regularly cleaned; individuals report terrible odors and infestations of flies in the showers. The vents in the cells are clogged with dirt and the cells are very cold and poorly insulated; on winter days some have frost on the inside of their windows. Recently, the hot water stopped working in the unit.

36. In the infirmary cells, the water coming from the sinks is often a brownish color and many are afraid to drink it. Following reports that water sources in parts of the facility were contaminated, Stateville previously provided individuals in custody with bottled water to drink. But since the closure, water deliveries have become more sporadic—recently no bottled water was delivered for 3-4 weeks in a row. Some individuals ran out and resorted out of desperation to drinking the water out of the sink, despite the fear of contamination. This was especially terrifying to some with renal failure, who fear they are more susceptible to harm because of the damage to their kidneys.

*Equip for Equality*

37. EFE is the federally mandated Protection & Advocacy ("P&A") system for the state of Illinois. As such, EFE's mission is to protect and advance the human and civil rights of people with disabilities in Illinois.

9

38. To achieve this mission, EFE focuses on certain substantive priorities which include: challenging discrimination and ensuring compliance with the Americans with Disabilities Act, promoting integration of people with disabilities in their communities, and ensuring quality care and safety.

39. The P&A system was born out of a federal legislative response to the prevalent discrimination against people with disabilities that occurs when they are segregated into institutions where neglect and abuse can too easily propagate. As a result, work to prevent the unlawful segregation and the discriminatory denial of services to people with disabilities is central to EFE's mission and priorities.

40. EFE serves individuals with disabilities throughout Illinois as well as their family members and provides means by which constituents can express their collective views. People with disabilities who are served individually or whose communities are served provide input to EFE through EFE's priorities setting processes, constituent surveys, advisory council and stakeholder meetings. EFE also has a grievance procedure so that individuals with disabilities have access to and input into EFE's scope of services and areas of work.

41. Through its annual priority-setting process, EFE solicits and receives input from its constituents. This input is used to prioritize EFE's objectives for the following service year to reflect the goals of those constituents. EFE's priorities for the 2024-2025 fiscal year include protecting individuals' right to be free from abuse, neglect, and exploitation in institutional settings, through a focus on improper restriction of rights of individuals, to be free from unnecessary restraint and seclusion, and to receive medical care.

42. Specific to criminal legal systems, EFE has a priority of addressing the disproportionate harms of incarceration on people with disabilities and enforcing the civil rights

of people with disabilities under the ADA and Rehabilitation Act in jails and prisons, including Stateville. Incarcerated people with disabilities are among the constituents who are served by, and who inform the work of, EFE.

43. EFE has advocated for people with disabilities in Illinois state prisons for many years in various contexts, including through advocacy, negotiations, and litigation. EFE has repeatedly raised with IDOC concerns for improper housing of people with disabilities, including at Stateville, as well as unlawful placement of people with disabilities in overly restrictive units due to their disabilities. Among other litigation efforts for incarcerated constituents, EFE has served as class counsel in multiple class action lawsuits on behalf of incarcerated people with disabilities in Illinois federal courts.

44. EFE's constituents include the exemplars described below, who are currently incarcerated at Stateville, have suffered injury, and continue to suffer injury due to IDOC's actions and inactions. These constituents' interests go to the heart of EFE's mission to ensure that people with disabilities are free from harm and discrimination and have equal access to programs and services they are entitled to under the ADA and Section 504.

*Exemplars*

45. As the P&A for Illinois, Equip for Equality's constituents include the individuals with disabilities confined at Stateville. The following individuals are EFE's constituents and provide examples of the significant harm being done by the violations at issue here.[2]

46. Exemplar #1 was housed in the general population "quarter house" units before Stateville closed and visited the health care unit for dialysis twice per week to treat his kidney failure. He uses a wheelchair because of debilitating leg cramps. Before the closure, he regularly

---

[2] Each of the "exemplars" —or examples of impacted individual constituents—is readily identifiable for the purpose of this case, but their names have been omitted from the complaint for their privacy.

attended commissary, law library, school, and mental health services. Since the closure, he has been confined in the infirmary because of his disability. When he is not on dialysis, he is locked in his cell for 22-24 hours a day. He is denied the activities, programs, and services that he used to attend and would attend at a functional prison. The isolation in the cell has caused the symptoms of his mental illness to become acute.

47. Exemplar #2 was housed in the general population "quarter house" units before Stateville closed and visited the health care unit for dialysis three times per week to treat his kidney failure. Before the closure, he regularly attended commissary, law library, and he was hoping to start taking college classes. Since the closure, he is denied all of these programs, services, and activities. He is instead locked in his cell most days with no meaningful activity.

48. Exemplar #3 also has end-stage renal failure, as well as type 1 diabetes, but does not require inpatient level of care. He was previously housed in the general population "quarter house" units and visited the health care unit for dialysis three times per week. Before Stateville closed, he had a job and took college courses. He regularly attended commissary and law library. After the closure, because of his disability, he was confined in the infirmary and denied these programs, services, and activities.

49. Exemplar #4 was housed in the general population "quarter house" units before Stateville closed and visited the health care unit for dialysis to treat his kidney failure and receive insulin for his Type 1 diabetes. Before Stateville closed, he regularly attended commissary, law library, and barbershop, and met with a mental health provider every two weeks. Since the closure, because of his disability he has been confined in the infirmary and denied these programs, services and activities.

50. Exemplar #5 was transferred to the infirmary before the closure—not because he required inpatient level of care—but to be placed in restrictive housing and there were not accessible cells available there. He is no longer on restrictive housing status but subsequently contracted an infection in the infirmary requiring a brief outside hospitalization. When the rest of Stateville closed, he was not transferred back to a general population unit nor to an appropriate infirmary placement at another facility. He was left in the inadequate infirmary at the closed Stateville where he no longer has equal access to commissary, law library, barbershop, or mental health programs.

51. Exemplar #6 has several medical conditions and limited mobility but was not housed in the infirmary before Stateville closed, as he did not require an inpatient level of care. Since the closure, he has been confined to the infirmary, because of his disability, where he no longer has access to commissary, law library or other programs, services and activities.

52. Exemplar #7 has stage four cancer and COPD and was already housed in the infirmary at the time Stateville closed. Before the closure, he had access to yard, religious services, commissary, and law library services that have since been eliminated or greatly reduced.

## COUNT I: VIOLATION OF TITLE II
## OF THE AMERICANS WITH DISABILITIES ACT (ADA)
### Against Defendant Hughes (IDOC)

53. Paragraphs 1-52 are incorporated by reference as though fully set forth herein.

54. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

13

55. The implementing regulations of the ADA require public entities, including prisons, to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

56. Specific to correctional settings, the regulations prohibit placing individuals with disabilities "in designated medical areas unless they are actually receiving medical care or treatment" or "in facilities that do not offer the same programs as the facilities where they would otherwise be housed." 28 C.F.R § 35.152(b).

57. The Illinois Department of Corrections is a public entity within the meaning of Title II of the ADA.

58. Plaintiff's constituents, including the exemplars described above, are qualified individuals with disabilities under the ADA because they are substantially limited in various major life activities.

59. Defendant violated Title II of the ADA by holding Plaintiff's constituents in unduly restrictive and isolating conditions compared to prisoners without disabilities, because of their disabilities.

60. Defendant violated Title II by depriving Plaintiff's constituents of access to programs otherwise available to prisoners because of their disabilities.

61. Defendant violated Title II by utilizing criteria or methods of administration that have the effect of subjecting Plaintiffs to discrimination on the basis of disability.

62. As a result of Defendant's actions or inactions, Plaintiff's constituents suffered injuries including the loss of programming and privileges, as well as physical, mental, and emotional injuries.

## COUNT II: VIOLATION OF THE REHABILITATION ACT
### Against Defendant Hughes (IDOC)

63. Paragraphs 1-52 are incorporated by reference as though fully set forth herein.

64. Section 504 provides that "[]no otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. § 794.

65. The Illinois Department of Corrections is subject to the Rehabilitation Act as a state agency that receives federal financial assistance. 29 U.S.C. § 794(b).

66. Plaintiff's constituents, including the exemplars described above, are qualified individuals with disabilities pursuant to the Rehabilitation Act because they are substantially limited in several major life activities.

67. Defendant violated the Rehabilitation Act by holding Plaintiff's constituents in unduly restrictive and isolating conditions compared to prisoners without disabilities, because of their disabilities.

68. Defendant violated the Rehabilitation Act by depriving Plaintiff's constituents of access to programs otherwise available to prisoners because of their disabilities.

69. Defendant violated the Rehabilitation Act by failing to provide Plaintiff's constituents with reasonable accommodations to allow them access to programs and services.

70. As a result of Defendant's actions or inactions, Plaintiff's constituents suffered injuries including the loss of programming and privileges, as well as physical, mental, and emotional injuries.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor as follows:

A. Declare that Defendant's actions and inactions are unlawful for the reasons specified above;

B. Enter preliminary and permanent injunctive relief enjoining the IDOC from (i) failing to comply with the federal disability rights laws and (ii) from discriminating on the basis of disability;

C. Award costs, expenses, and reasonable attorneys' fees; and

D. Grant such additional relief as the Court deems just and proper.

Dated: February 13, 2025

EQUIP FOR EQUALITY,

By: s/Steven P. Blonder
 One of its Attorneys

Sophia Lau
Amanda Antholt
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, Illinois 60602
(312) 895-7324 / (312) 895-7330
Sophia@equipforequality.org
Amanda@equipforequality.org

Steven P Blonder (6215773)
Patrick B. Barnett (6326570)
Much Shelist, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606
P:312.521.2402
sblonder@muchlaw.com
pbarnett@muchlaw.com